UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL MOLAISON                          CIVIL ACTION

VERSUS                                    NUMBER: 07-3746

MICHAEL J. ASTRUE,                        SECTION: "M"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration terminating plaintiff's Social Security benefits.  (Rec. docs. 12, 13).

Michael Molaison, plaintiff herein, filed an application for Disability Insurance Benefits ("DIB") on November 16, 2000, alleging disability as of May 22, 2000 due to right wrist and right knee problems.  (Tr. p. 31). Following the denial of that application at the initial and reconsideration levels, on August

23, 2001, an Administrative Law Judge ("ALJ") found that plaintiff was disabled as of the asserted onset date due to 2 fractures of the right forearm, status post application of external fixator, osteomyelitis, arthrosis at the radioulnar joint, carpal impingement, additional wrist surgery circa November of 2000, and chondroplasty of the right patella, thus satisfying the criteria of Section 1.12 of the Listing of Impairments.  (Tr. pp. 27-34).

On April 9, 2004, plaintiff was advised that his condition was being reviewed to determine his continued eligibility to receive Social Security benefits. (Tr. pp. 37-38).  In a "Report of Continuing Disability Interview" dated April 21, 2004, plaintiff advised that he now suffered from a pinched nerve in the neck in addition to the wrist injury for which benefits had previously been awarded.  In terms of activities at the time, plaintiff reported that he largely took care of his own personal needs, helped with household chores as best as he could, occasionally went fishing, and drove his truck as needed.  Plaintiff further reported that he had worked for 3 stints ranging from 2 to 5 months since he had been found disabled, ultimately leaving the last job in March of 2004 so that he could return to school to obtain the training necessary to pursue another line of work.  That pursuit, however, got side-tracked after plaintiff's vocational counselor told him that he would need to be discharged from his doctor's care before

he could take part in a functional capacity evaluation preparatory to any needed training.  No obvious difficulties were noted by the Administration case worker who conducted the interview of plaintiff. (Tr. pp. 69-78).  In a Work Activity Report dated April 22, 2004, plaintiff explained that he had worked for a relative at his most recent job who had made special accommodations in light of his condition. (Tr. pp. 79-86).

On May 26, 2004, a Disability Examiner/Claims Representative from the state reviewed plaintiff's file and determined that he was no longer disabled as of May 26, 2004. (Tr. p. 35).  Formal notice advising plaintiff that his benefits would be terminated was issued on May 27, 2004.  (Tr. pp. 39-41).  Plaintiff then requested reconsideration of that determination on June 14, 2004.  (Tr. pp. 42-42A).  In a Disability Report-Appeal form which he had completed on June 8, 2004, plaintiff indicated that he was experiencing increased pain in his neck and upper back.  Plaintiff was receiving treatment for those conditions from Dr. Donald Gervais who instructed him not to work pending labwork and the possibility of being cleared to perform light-level activity.  (Tr. pp. 104-110).  The administrative record also contains two "Activities of Daily Living Forms", one of which is dated June 24, 2004.  In those forms, plaintiff reported that he was able to attend to his own personal needs, cook simple meals, occasionally help clean the

3

house, cut the grass with a riding lawnmower, drive, shop, and occasionally fish. (Tr. pp. 89-103).

As part of the reconsideration process, a hearing before a Disability Hearing Officer ("DHO") went forward on December 1, 2004 with plaintiff in attendance. At that time, plaintiff was taking college courses 5 days per week in accounting technology. After considering plaintiff's testimony and the medical evidence of record, on December 7, 2004, the DHO issued a written decision in which he agreed that plaintiff was no longer disabled. (Tr. pp. 43-44). However, the cessation date of plaintiff's diability was changed to May 31, 2004. (Tr. p. 36). Formal notice of the DHO's decision was mailed to plaintiff on December 17, 2004. (Tr. p. 43). Plaintiff then filed a request for a hearing before an ALJ on December 27, 2004. (Tr. pp. 56-57). Pursuant to that request, a hearing de novo before an ALJ went forward on October 25, 2006 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 329-347). On March 19, 2007, the ALJ issued a written decision in which he, too, concluded that plaintiff's disability ended as of May 31, 2004. (Tr. pp. 11-22). After receiving an additional submission from plaintiff's attorney, on May 24, 2007, the Appeals Council ("AC") denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner.

4

(Tr. pp. 9, 6-8).   It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1. the ALJ erred in finding that plaintiff's condition had improved, and that he is now able to perform substantial gainful activity.

2. the ALJ relied on an incomplete hypothetical question to the Vocational Expert.

3. the ALJ erred by substituting his opinion for that of the treating physician, in violation of SSR 96-7p and 20 C.F.R. §404.1527.

(Rec. doc. 12-2, pp. 4, 7, 10).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1. [t]he most recent favorable medically-based decision finding that the claimant was disabled is the decision dated August 23, 2001.  This is known as the "comparison point decision" or CPD.

2. [a]t the time of the CPD, the claimant had the following medically determinable impairments: two fractures of the right forearm; status-post application of an external fixator; osteomyelitis; arthritis at the radioulnar joint; carpal impingement; additional wrist surgery in November 2000; chondroplasty of the right patella.  These impairments were found to meet section 1.12 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).

3. [t]he claimant engaged in substantial gainful activity in 2002, prior to the date disability was found to have ceased.  (20 CFR 404.1594(f)(1)).

5

4.   [s]ubsequent to the comparison-point decision, the medical evidence shows additional impairments including broad-based posterior disc osteophyte complexes at C3-4, C4-5 and C5-6 with slight spinal cord narrowing and slight flattening of the ventral surface of the cord and C5-6 radiculopathy.  (Exh. B-12F3/4).

5.   [a]s of May 31, 2004, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

6.   [m]edical improvement occurred as of May 31, 2004.  (20 CFR 404.1594(b)(1)).

7.   [t]he claimant's medical improvement is related to the ability to work because, as of May 31, 2004, he no longer had an impairment or combination of impairments that met or medically equaled a listing (20 CFR 404.1594(c)(3)(i)).

8.   [a]s of May 31, 2004, the claimant's impairments were severe (20 CFR 404.1594(f)(6); Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and SSR 96-3p).

9.   [a]fter careful consideration of the entire record, the undersigned finds that, as of May 31, 2004, the claimant had the residual functional capacity to perform a limited range of light work.

10.  [a]s of May 31, 2004, the claimant was unable to perform past relevant to work (20 CFR 404.1565).

11.  [o]n May 31, 2004, the claimant was a younger individual age 18-44 (20 CFR 404.1563).

12.  [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

13.  [b]eginning on May 31, 2004, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills

(See SSR 82-41 and CFR Part 404, Subpart P, Appendix 2).

14.  [a]s of May 31, 2004, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

15.  [t]he claimant's disability ended as of May 31, 2004 and he has not been under a "disability" at any subsequent time through the date of this decision. (20 CFR 404.1594(f)(8)).

(Tr. pp. 15-17, 20-22).

Judicial review of the Commissioner's decision to terminate Social Security benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind

7

might accept as adequate to support a conclusion. <u>Jones v.</u>
<u>Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not
reweigh the evidence or try the issues <u>de</u> <u>novo</u>, nor may it
substitute its judgment for that of the Commissioner. <u>Cook v.</u>
<u>Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the
evidence are for the Commissioner to resolve, not the courts.
<u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

In termination cases like this one, the Commissioner may
discontinue Social Security benefits if substantial evidence
demonstrates that: (1) there has been medical improvement related
to an individual's ability to work and (2) the individual is now
able to engage in substantial gainful activity. 42 U.S.C. §423(f);
20 C.F.R. §404.1594(a). Medical improvement is defined as any
decrease in the medical severity of a claimant's impairment which
was present at the time of the most recent favorable medical
decision that the claimant was or continued to be disabled. 20
C.F.R. §404.1594(b)(1). The second part of the evaluation process
relates to the ability to engage in substantial gainful activity.
In making this determination, the Commissioner unitizes the 8-step
sequential analysis set forth in 20 C.F.R. §404.1594(f), as
follows:

    1. is the claimant engaged in substantial gainful
    activity? (If so, the disability has ended).

2.   if not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so the disability is continuing).

3.   if not, has there been medical improvement?

4.   if there has been medical improvement, is it related to the claimant's ability do work?

5.   if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable?  (If not, the disability is continuing).

6.   if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended).

7.   if so, is the claimant able to engage in past relevant work? (If so, the disability has ended).

8.   if not, is the claimant able to perform other substantial gainful activity?

> See also Griego v. Sullivan, 940 F.2d 942, 944 n.1 (5th Cir. 1991).

Plaintiff was the first witness to testify at the evidentiary hearing held on October 25, 2006.  His past relevant work had been as a sheet metal worker and pipefitter, medium to heavy unskilled labor.  Since being awarded benefits in 2001, plaintiff had attempted to return to the job market on several occasions, first working 3 months as a tacker at Bollinger Shipyards, a job that required a good deal of bending and heavy lifting.  Plaintiff

ultimately left that job because it was too strenuous on his neck and arm due to underlying left carpal tunnel surgery which was the result of being unable to use his right hand for 2 years.  In the second job that he had attempted, plaintiff worked for a company named Aqua Safety at which he re-fiberglassed and spray-painted lifeboats.  That company was run by plaintiff's cousin who made various workplace accommodations such as allowing plaintiff to work in a seated position and to take numerous breaks throughout the day.

At the time of the hearing, plaintiff was being treated by Doctors Gervais, Heidenreich, and Ray.  At the request of Dr. Gervais, plaintiff had recently undergone an MRI which reportedly revealed a pinched nerve in a deteriorating disc, worse on the right, with pain radiating into the arms and tennis elbow requiring cortisone injections.  For pain relief, plaintiff took Methadone in addition to Diazepam.  (Tr. p. 337).  Although the medication did lessen the everyday pain that plaintiff experienced in his neck and arms, it left him drowsy and in need of a nap.  Plaintiff saw Dr. Ray for chronic prostatitis which caused constant, severe lower back pain and frequent urination during the night.

In terms of daily activities, plaintiff testified that the only housework he was capable of doing was dusting.  He could drive to the grocery store located .5 miles away and typically napped

10

before and/or after lunch for 30 to 90 minutes at a time. Plaintiff estimated that he could lift 20 pounds occasionally, 3 to 10 pounds frequently; could stand for 10 to 15 minutes at a time; could sit for 20 minutes at a time; and, could walk .25 miles the last time he tried. Although plaintiff had underdone surgeries to his right arm following his on-the-job accident in 2000, he also had a permanent plate in his left hand in addition to undergoing carpal tunnel surgery on that side. Since the time that he was declared to be disabled, plaintiff had taken two semesters of college courses but had to stop due to back pain when sitting. Overall, plaintiff remained unable to work due to pain and sleeplessness. (Tr. pp. 331-341).

Edward Ryan, a VE, was next to take the stand. The ALJ posed a hypothetical question to Ryan which assumed an individual of plaintiff's age, education, and work experience who could lift 20 pounds occasionally, 10 pounds frequently; could stand, walk, and/or sit for 6 hours per 8-hour workday; who had 4/5 grip strength on the right; and, who was restricted from overhead reaching, balancing, using ladders, ropes, or scaffolds and work at unprotected heights or around dangerous machinery. Faced with that profile, Ryan testified that the described individual could not perform plaintiff's past work. However, the person could function as a cashier, dispatcher, or general office clerk, with significant

11

numbers of such jobs being present in the national and local economies. To the hypothetical as originally framed, the ALJ reduced the maximum lifting capability to 10 pounds and the standing/walking capability to 2 hours her 8-hour workday but the VE's answer to the amended hypo is not apparent from the record. The VE did testify, however, that if the person missed in excess of 2 days per month or was otherwise unable to work a full 40-hour week due to fatigue, a lack of concentration, or the like that there would be no jobs that the individual could perform. Plaintiff's counsel had no questions for the VE but did close the hearing by emphasizing plaintiff's work history and the fact that his insured status was such that he could actually attempt another trial work period. (Tr. pp. 341-347).

The medical records generated in the roughly 1-year period prior to the date that plaintiff's disability status was reviewed begin with an operative report dated March 19, 2003 documenting his carpal tunnel decompression on the left. (Tr. pp. 241-242). Plaintiff returned to his surgeon, Dr. Harold Stokes, 1 week post-op for removal of his sutures and the wound was healing nicely at the time. (Tr. p. 266). Plaintiff had recovered sensation in the effected area by April 21, 2003 and he expressed pleasure at the result. (Tr. p. 265). On May 15, 2003, plaintiff was seen by Dr. Eric George for treatment of his right index finger following an

12

injury involving a truck door.  A splint and various medications were prescribed.  (Tr. p. 264).  Plaintiff's finger was much improved by May 19, 2003 with no sign of infection.  (Tr. p. 263).

On August 4, 2003, plaintiff was seen by Dr. Jack Heidenreich for a check-up and a refill of his Valium which he took 3 times daily for anxiety.  The doctor noted that plaintiff had recently undergone a carpal tunnel release and his right arm was "... doing very well."  Plaintiff had a part-time job at that time.  The results of the exam were normal and plaintiff was given a refill on his medication.  (Tr. p. 248).

Dr. Stokes corresponded with a representative from plaintiff's insurance company on October 15, 2003 and reported that plaintiff had experienced a popping sensation on the flexor surface of his right wrist 2 weeks earlier.  Initial swelling to the area had gone down but plaintiff still had some burning discomfort about the wrist.  Examination revealed no change in the range of motion of the right wrist or forearm but there was mild point tenderness on the flexor surface of the distal radius.  X-rays were normal. Dr. Stokes opined that plaintiff may have broken up an adhesion in the wrist which was to be monitored over time.  (Tr. p. 262). Plaintiff's wrist pain had diminished by November 12, 2003 but he was now experiencing some discomfort over the head of the screw in the distal ulna.  However, plaintiff was inclined to leave the

screw in place.  (Tr. p. 261).

Plaintiff returned to Dr. Heidenreich on February 3, 2004 with complaints of tendonitis to the left elbow as well as neck pain. The diagnosis was neck pain with possible radiculopathy and elbow pain.  Plaintiff received an injection to the elbow, was prescribed Zaraflex for his neck pain, was to undergo an MRI of the neck, and was referred to Dr. Gervais, a neurologist.  He was also given a refill for Valium. (Tr. p. 247).  The recommended MRI was performed on February 4, 2004.  That testing revealed minimal bulging of the disc at the C5-6 level which was slightly impressing the thecal sac just to the left of midline; there was narrowing of the nerve root foramina.  At the C6-7 level, there was minimal posterior bulging of the disc slightly impressing the thecal sac.  Other cervical level discs were described as normal. (Tr. p. 278).

Plaintiff was next seen by Dr. Heidenreich on March 23, 2004 for complaints of lower back pain at the tailbone.  The assessment was sacroiliac back neuralgia and plaintiff was prescribed Toradol and was scheduled for x-rays of the effected area.  (Tr. p. 245). When plaintiff returned to Dr. Stokes on March 31, 2004, he asked that  the screw in his hand be removed as it was continuing to produce pain over the head.  Plaintiff also complained of pain in the left elbow which he attributed to a fall in 2000.  Arrangements were to be made to have the particular hardware removed.  (Tr. p.

14

260).  That procedure was performed by Dr. Stokes on April 15, 2004 and plaintiff was discharged home with instructions to avoid heavy lifting or straining and strenuous activity.  (Tr. pp. 251-257).

Plaintiff was seen again by Dr. Stokes on April 21, 2004 and was cleared to resume regular activities after having his sutures removed. (Tr. p. 259).  He was next seen by Dr. Michael Haydel of the Pain Speciality Center on May 4, 2004 for complaints of neck pain and left upper extremity symptoms as well as low back pain. EMG studies had apparently been done which were consistent with left C6 radiculopathy.  The impression was cervical radiculopathy. Plaintiff was administered a steroid injection to the effected site and was prescribed oral pain medications including Vicodin ES. (Tr. p. 277). On May 26, 2004, plaintiff was evaluated by Dr. Donald Gervais of the Southeast Neuroscience Center of Excellence for complaints of neck pain and elbow pain. Dr. Gervais noted that although plaintiff had been prescribed a 30-day supply of Vicodin ES by Dr. Haydel, plaintiff reported that he had exhausted the supply 1.5 weeks earlier.  The doctor also noted plaintiff's tendency to unilaterally and spontaneously cease taking the medications that had been prescribed to him, including Neurontin, Lamictal, Skelaxin, and Lidoderm patches, despite the doctor's advices to the contrary.  Recent lab studies on April 26, 2004 were positive for opioids, hydromorphone, and hydrocodone.  On physical

15

examination, plaintiff had some tenderness over the left shoulder and elbow but no visible spasms were noted and range of motion was intact. The diagnosis was neck pain with mild C-6 radiculopathy. The plan was for Dr. Gervais to rule out symptom embellishment and drug seeking behavior through a series of tests. (Tr. p. 281).

On the same day that plaintiff was evaluated by Dr. Gervais an Administration medical consultant reviewed plaintiff's file and completed the standardized form denominated "Physical Residual Functional Capacity Assessment". There, the consultant found that plaintiff could lift and/or carry 20 pounds occasionally, 10 pounds frequently; could stand, walk, and/or sit for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; and, had no postural, manipulative, visual, communicative, or environmental limitations. In completing the form, the consultant noted that he was taking Dr. Stokes' opinions into consideration but that such opinions bearing on the level of work or the ability to engage in past relevant work were ultimate issues reserved to the Commissioner. (Tr. pp. 267-275). The consultant also completed a separate form captioned "Continuing Disability Review (CDR Worksheet)" which compared the signs, symptoms, and lab results that were present when plaintiff was awarded benefits on August 23, 2001 (the "comparison point decision") with those that were present on that date, finding that plaintiff had experienced medical

16

improvement related to his ability to work.  In doing so, the consultant noted that plaintiff "... ha[d] ticket to work". (Tr. p. 275).

Plaintiff returned to Dr. Haydel on June 1, 2004 and his condition was essentially unchanged but he did report relief from chiropractic treatment and oral medications.  Dr. Haydel gave plaintiff a temporary refill of Vicodin ES, noting that he was scheduled to see Dr. Gervais in the near future. (Rec. doc. 276). Plaintiff was then seen by Dr. Gervais on June 7, 2004 for follow-up of his neck pain.  He admitted obtaining pain medication from Dr. Haydel and Dr. Gervais was still concerned about possible drug-seeking behavior. On physical examination, plaintiff had persistent bilateral cervical tenderness but with no particular spasm. Although range of motion was somewhat limited due to pain, reflexes and strength appeared intact and there were no fixed sensory deficits.  Pending the results of further urinalysis, Dr. Gervais declined to change plaintiff's work status which was not readily apparent from a review of the doctor's previous treatment records. (Tr. p. 279). In another note that appears to be dated June 18, 2004, Dr. Gervais documented plaintiff's complaints of burning neck pain radiating between the shoulder blades continuously throughout the day.  The pain was described as a "7" on a scale of 1 to 10 but plaintiff was taking no pain medication at the time.   The

17

impression was intractable neck pain.  Plaintiff was started on Soma and Keppra and was "ke[p]t off work" until he could be reevaluated. (Tr. p. 280).

On July 15, 2004, a second Administration medical consultant reviewed plaintiff's file and affirmed the residual functional capacity assessment that had been made on May 26, 2004. (Tr. p. 282).  Plaintiff was next seen by Dr. Gervais on August 11, 2004. Plaintiff reported positive results from taking Soma but only for about 3-4 hours and he was now experiencing hand numbness as well. There was tenderness in the left trapezius area but range of shoulder motion was intact.  Sensory examination revealed decreased sensation in the left median nerve but there was no motor weakness. The diagnosis was neck pain with C6 radiculopathy that appeared to be mild and left carpal tunnel syndrome.  The dosages of Soma and Keppra were increased and Dr. Gervais extended plaintiff's work status, opining that "I do not feel he is able to engage in any type of activity whatsoever." (Tr. pp. 301-302).

On September 20, 2004, plaintiff was consultatively evaluated by Dr. Gerry Carroll.  Plaintiff's complaints at the time were pain in the right forearm and right hand as well as diminished grip strength.  Plaintiff also complained of neck pain radiating to the left arm.  Medications at the time included Soma, Keppra, Valium, and Vicodin as needed.  Reported daily activities included

18

attending college, reading, performing light household chores, and watching television.  On physical examination, plaintiff had a full range of motion of the cervical spine with no pain or spasm.  There was inward bowing of the right forearm with mild deformity of the right wrist with diminished range of motion but there was a full range of motion in the right elbow and right shoulder.  The right knee had a full range of motion with no pain or spasm.  There was mildly impaired grip strength of the right hand rated as 4/5 when compared with 5/5 as to the left but there was no sensory deficits, reflexes were intact, and station and gait were normal.   In addition to the physical examination findings, Dr. Carroll had before him the records from plaintiff's treating orthopedist as well as x-rays of the cervical spine and the right forearm, hand, and wrist.  The diagnosis was: 1) fracture of the right wrist in May of 2000 with multiple complications and surgical procedures resulting in deformity and shortening of the right forearm and causing moderate functional limitations to the right wrist and mildly impaired grip strength of the right hand; 2) a history of torn tendons of the right knee post op arthrosporic repair without residuals; 3) a history of cervical disc disease with radiculopathy under conservative management; and, 4) post op status involving the right wrist and right knee.  In Dr. Carroll's opinion, plaintiff had moderate limitations of the right forearm and wrist with mildly

19

decreased grip strength but no functional limitations involving the right elbow, shoulder, or knee. (Tr. pp. 283-291).

Plaintiff returned to Dr. Gervais on October 12, 2004 for a regular follow-up visit.  He reported no change to his neck pain since his previous visit as well as headaches 3-4 times per week and occasional shooting pain in the left elbow from the neck.  On physical examination, there was tenderness over the left trapezius. The diagnosis was left carpal tunnel syndrome and C6 radiculopathy/neck pain for which plaintiff was continued on Keppra. (Tr. p. 300).  Plaintiff was next seen by Dr. Gervais on March 8, 2005 and his condition was essentially unchanged.  His headaches were relieved by some unidentified medication he had obtained from his girlfriend and he was said to be doing well on Soma.  The only abnormal finding following a physical examination was tenderness over the cervical spine.  The impression was C6 cervical involvement and neck pain and plaintiff was continued on Soma. (Tr. p. 299).  Plaintiff's neck pain was the same on January 6, 2006 but his carpal tunnel problems had improved.  However, right elbow pain and stiffness had begun several months earlier and was worse in the past few weeks. Keppra was reportedly of little benefit anymore.  Another medication was to be substituted and the dosage of Soma was to be reduced. (Tr. p. 298).

On March 31, 2006, plaintiff was evaluated by Dr. Truett Ray

for prostate problems. Plaintiff's sole medication at the time was identified as Methadone.  The diagnosis was prostatitis and Bactrim was prescribed. (Tr. pp. 311-312).  By April 20, 2006, plaintiff was said to be doing better through the use of prescribed medication.  That course of action was continued and a CT stone study was to be performed. (Tr. p. 310).  That study produced normal results and plaintiff was so advised on April 26, 2006. (Tr. pp. 308-310).  Following two reschedulings and one cancellation, plaintiff was next seen by Dr. Ray on June 6, 2006.  Plaintiff's symptoms had increased by this time and he was prescribed Cipro for a recurrence of his prostatitis. (Tr. p. 307).  Plaintiff was still suffering from lower back pain, worse in the morning, and other symptoms as a result of his prostatitis when he was next seen by Dr. Ray on June 21, 2006.  The assessment was chronic prostatitis and low back pain and plaintiff was started on various new medications, including Lortab. (Tr. p. 306).  On that same day, plaintiff underwent an MRI of the cervical spine.  That test revealed small, broad-based posterior disc osteophyte complexes at C3-4, C4-5, and C5-6, with the largest being at C5-6 which was slightly narrowing the spinal canal and slightly flattening the ventral surface of the cord.  Uncovertebral spurring  was causing a few levels of foraminal narrowing that appeared most advanced on the left at C5-6 where the foramen was rather severely narrowed.

An MRI of the thoracic spine was normal. (Tr. pp. 295-297).

Plaintiff was next seen by Dr. Gervais on August 8, 2006 for follow-up evaluation.  He complained of worsening neck pain at the time, particularly in the left deltoid area, and pain in the left elbow that was relatively new.  The previously-prescribed Lyrica had provided relief but plaintiff had exhausted his supply of the drug.  Plaintiff had tenderness in his right elbow greater than his left and some tenderness on the left side of his neck with a positive Spurling sign on turning the neck to the right in a left C6 distribution. He also had some tenderness in the lumbar spine. No muscular atrophy was present and there was normal tone throughout with fine motor function being dextrous bilaterally. The impression was left C5-6 radiculopathy, low back pain, and elbow pain which was likely to be tendonitis.  Plaintiff was restarted on Lyrica and was started on Mobic.  Surgical evaluation was deferred and plaintiff was to be seen again in 3 to 4 months. (Tr. pp. 293-294).

On August 17, 2006, plaintiff returned to Dr. Ray for further evaluation of his prostatitis.  Plaintiff was still having some lower back pain at the time.  The diagnosis was chronic prostatitis and various medications were prescribed. (Tr. p. 305).  As noted earlier, the hearing de novo before the ALJ went forward on October 25, 2006. (Tr. pp. 329-347).

By letter dated November 13, 2006, plaintiff's counsel provided the ALJ with 2 forms that had been completed by Dr. Gervais on November 9, 2006. The first form, denominated "Pain Interrogatory", contained 5 questions, only 3 of which were answered by the doctor. Although Dr. Gervais failed to answer the first question which asked how long he had treated plaintiff and for what condition, he answered the second question to identify EMG and some other largely illegible writing when asked to "... state the clinical findings and test results in support of the condition(s)". In the third question, the doctor was asked to explain/describe whether the conditions for which he was treating plaintiff were the type that could reasonably be expected to produce pain. While difficult to decipher, Dr. Gervais' answer to that question appears to be to the effect that medication caused sedation. The fourth question on the form asked as follows: "[p]lease discuss your patient's complaints. Are they credible and consistent with his/her conditions? Please elaborate." In answer to that narrative-type question, the doctor simply wrote "yes". The unanswered fifth question sought any additional comments. (Tr. pp. 313-316).

The second form completed by Dr. Gervais was a 3-paged document captioned "Physical Capacity Evaluation". There, the doctor indicated that plaintiff could stand less than 2 hours per

23

8-hour workday, could walk less than 1 hour during the same time period, and could sit less than 4 hours in the same time period. Dr. Gervais further indicated that, as a result of his cervical radiculopathy, plaintiff could occasionally lift/carry up to 20 pounds and could frequently lift/carry less than 10 pounds; could not use his hands for repetitive pushing and pulling; could occasionally bend, kneel, squat, and climb stairs but could never crawl or climb ladders; and, was unable to reach above shoulder level.  Additional boxes were checked off on the form indicating that plaintiff had moderate and marked limitations in his ability to perform activity within a schedule, maintain regular attendance, and be punctual with a customary tolerance; that he had marked limitations in his ability to complete a normal workday and work week without interruptions from medically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, that he had a moderate limitation on his ability to tolerate stress. (Tr. pp. 317-319).

As noted earlier, plaintiff challenges the Commissioner's decision to discontinue Social Security benefits on three grounds. In the first of those, plaintiff generally argues that the ALJ erred in finding that his condition had improved and that he was now capable of performing substantial gainful activity.  Under the rubric of that general argument, plaintiff essentially alleges that

24

the ALJ failed properly to consider the effects of his new diagnoses and limitations due to pain and medication in combination with residual effects of the trauma to his right arm.  For the reasons that follow, the Court disagrees.

At the outset of his written decision of March 19, 2007, the ALJ properly recalled his obligation, at various steps of the §404.1594(f) analysis, to consider the combination of plaintiff's impairments for Listing-level purposes, for severity purposes, and for purposes of determining plaintiff's residual functional capacity to work. (Tr. p. 14).  Having done that, the ALJ then made detailed findings of fact and conclusions of law consistent with the duties set forth in the Regulations.  In the 15-month period preceding the award of benefits on August 23, 2001, plaintiff had experienced the following events which were fairly characterized by Dr. Carroll in his consultative evaluation report:

> [t]he patient reports an on the job accident in May of 2000. He injured his right wrist, right knee and neck.  He sustained a fracture at the right wrist and underwent ORIF.  After removal of the orthopedic hardware ten weeks after the initial surgery, he contracted a staphylococcal wound infection which progressed to osteomyelitis of the distal radius and required six weeks of intravenous antibiotics.  He made a full recovery from osteomyelitis.  Approximately six months after his injury he underwent arthrosporic surgery on his right knee to repair damaged tendons. Due to the shortening of the radius after the staphylococcal infection, the patient

25

underwent a Sauve-Kapandji procedure to
shorten the ulnar. He was convalescing from
these procedures when he sustained a fall
resulting in a fracture of the proximal right
radius, the site of the previous
staphylococcal osteomyelitis. He required
debridement and ORIF using a bone graft.

(Tr. p. 283).

Proceeding through the required analysis, the ALJ next
observed that plaintiff had begun suffering from cervical problems
subsequent to the award of benefits but that he no longer had an
impairment or combination of impairments that met Listing-level
severity. (Tr. pp. 15-16). As respects plaintiff's right upper
extremity, the ALJ noted that the last surgery that had been
performed on that area was on April 15, 2004, prior to the date
disability was determined to have ceased, when a remaining screw
and washer were removed by Dr. Stokes in an out-patient setting.
At that time, plaintiff was only restricted from heavy
lifting/straining or strenuous activities and by April 21, 2004, he
was advised to resume his regular activities. Prior to that,
plaintiff had seen Dr. Heidenreich for a check-up on August 4, 2003
and his right arm was said to be doing well. The results of the
doctor's examination were normal and plaintiff even had a part-time
job. Range of motion to the right wrist and forearm was unchanged
on October 15, 2003 and x-rays were normal and did not demonstrate
non-union at the fracture site. When examined by Dr. Carroll on

26

September 20, 2004, plaintiff had only a diminished range of motion to the right wrist but had a full range of motion to the right elbow. Grip strength was 4/5 on the right but there were no sensory deficits and reflexes were intact. The most recent medical records were largely for treatment to plaintiff's cervical area or for prostatitis. Compared with the condition of his right arm as it existed in 2000/2001, the objective medical evidence demonstrated only a mild residual impairment to that extremity which no longer met a Listing and did not, singly or in combination with plaintiff's other impairments, render him unable to perform any work whatsoever.

With respect to plaintiff's right knee, another recognized condition noted in the favorable decision of August 23, 2001, the ALJ also properly determined that it no longer caused limitations that alone or in combination with plaintiff's other impairments precluded the performance of all work. None of the records generated in 2003 or thereafter involve treatment of the knee and Dr. Carroll found that plaintiff had no limitations resulting from the surgery he had undergone in January of 2001. The ALJ also considered the medical evidence pertaining to plaintiff's cervical condition and correctly found that it was not of Listing-level severity based on the lack of objective findings establishing the required motor loss and atrophy. (Tr. p. 16). He additionally took

27

notice of plaintiff's treatment records from Dr. Ray wherein plaintiff was prescribed various medications on 5 occasions between March 31, 2006 and August 17, 2006 but no limitations were imposed by the doctor. (Tr. p. 17).

While finding that none of the foregoing impairments, whether considered singly or in combination, met or medically equaled one of those set forth in the Listing of Impairments, the ALJ then concluded that the impairments were severe within the meaning of the Regulations. (Tr. p. 17). After making that finding, the ALJ proceeded to determine plaintiff's residual functional capacity in light of the objectively-supported limitations resulting from all of his impairments. (Tr. pp. 17-20). Restrictions on plaintiff's lifting and carrying abilities were made based on his history of severe right upper extremity fractures and the residual functional impact of mildly impaired grip strength. (Tr. p. 17). The full range of light work was further restricted by additional limitations resulting from his cervical impairment including the ability to reach overhead, climbing, pushing, pulling, etc. (Tr. p. 17). No objective basis for sitting limitations was recognized and plaintiff's ability to walk and/or stand was determined in full recognition of his January 2001 arthroscopy to the knee. (Id.).

Next, the ALJ evaluated the symptoms and limitations testified to by plaintiff at the administrative hearing in light of the

factors set forth in 20 C.F.R. §404.1529(c). (Tr. pp. 18-20).  The ALJ noted that the MRI findings from February 4, 2004 and June 21, 2006 were essentially the same.  Between those 2 dates, plaintiff had seen Dr. Gervais on 7 occasions.  On most of those occasions the diagnosis was simply neck pain with mild C6 radiculopathy. Plaintiff had also completed an Activities on Daily Living Form in which he reported that he was able to cook, assist with household chores, cut the grass with a riding lawnmower, drive, shop, and occasionally fish.  Reports such as these may properly be considered by the ALJ in determining a claimant's disability status.  Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995); Villa, 895 F.2d 1022-23.

        The ALJ also considered plaintiff's testimony regarding medication side-effects and found it less than credible when measured against the objective evidence.  Plaintiff testified that he took Methadone 4 times per day for pain relief which made him drowsy and resulted in him having to take 30-90 minute naps during the day.  On October 25, 2006, the same day as the administrative hearing, plaintiff provided the Administration with a list of medications which indicated that Methadone had been prescribed by Dr. Heidenreich.  Yet the only treatment notes from Dr. Heidenreich present in the record are from August 4, 2003, February 3, 2004, and March 23, 2004.  (Tr. pp. 245-248).  None of those records

contain any mention of Methadone.  In a similar vein, none of the records of Drs. Stokes, Haydel, Gervais, Carroll, or Ray make mention of a prescription for or use of Methadone nor do they contain any complaints from plaintiff about any medication side-effects.

In assessing plaintiff's residual functional capacity, the ALJ also took into account the testimony and evidence regarding the level of pain plaintiff was experiencing and its effect on his ability to work. Plaintiff saw Dr. Gervais a total of 8 times between May 26, 2004 and August 8, 2006.  On at least half of those occasions the diagnosis was neck pain with mild C-6 radiculopathy and the treatment that was rendered was conservative in nature through the use of oral medications.  Dr. Carroll's objective findings similarly fail to provide an objective basis for the debilitating level of pain plaintiff testified to.

Finally, after determining plaintiff's residual functional capacity and concluding that it precluded him from performing his past relevant work, the ALJ found that plaintiff's ability to engage in a full range of light-level work was reduced by the objectively-supported limitations resulting from his various impairments. (Tr. p. 21).  Citing the VE's testimony, the ALJ concluded that plaintiff was capable of performing certain jobs in the light exertional level. (Tr. pp. 21-22).

The responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance.  <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Griego v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991); <u>Wren v. Sullivan</u>, 925 F.2d 123, 129 (5th Cir. 1991); <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990).  In addition, the law is clear that the burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of.  <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989).  The ALJ must then weigh the plaintiff's testimony and subjective complaints against the objective medical evidence that has been produced.  <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing <u>Jones</u>, 702 F.2d at 621 n. 4). The evaluation of a plaintiff's subjective symptoms is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.  <u>Harrell</u>, 862 F.2d at 480.  The ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective medical evidence and articulates his reasons for doing so.  <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing <u>Abshire v. Bowen</u>, 848 F.2d 638, 642 (5th Cir. 1988)).

31

Contrary to plaintiff's present assertion, the ALJ did consider the combined effect of his impairments as well as any limitations resulting from medication side-effects or pain in determining his continued entitlement to Social Security benefits. The subjective complaints testified to by plaintiff at the administrative hearing were credited only to the extent that they were supported by the credible, objective medical evidence of record.  The mere fact that plaintiff has been diagnosed as suffering from various conditions does not, in and of itself, compel the conclusion that he continued to be disabled nor does the mere existence of pain or the fact that he may be unable to work without experiencing pain constitute an automatic ground for obtaining disability benefits.  <u>Owens v. Heckler</u>, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing <u>Jones</u>, 702 F.2d at 621 n.4).

In his second challenge to the Commissioner's decision plaintiff alleges that the ALJ relied on an incomplete hypothetical question to the VE in deciding whether to terminate Social Security benefits.  As noted earlier, one of the follow-up hypothetical questions posed to the VE by the ALJ included work absences of greater than 2 per month and an inability to work a full 40-hour workweek due to fatigue, lack of concentration, or the need to take excessive breaks.  If that were the case, the VE testified, the individual described in the hypothetical question could not work.

Plaintiff points to the Physical Capacity Evaluation form completed by Dr. Gervais on November 9, 2006 as providing support for the non-exertional limitations included in the particular hypothet and argues that the ALJ should have credited those and found that his disability continued.

In evaluating the correctness of a hypothetical question posed to a VE at an administrative hearing, the Fifth Circuit has observed as follows:

> [u]nless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.

> Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

In Body v. Apfel, 239 F.3d 698 (5th Cir. 2001), a post-Bowling case, the Fifth Circuit found that the hypothetical question to the VE did not "'...incorporate reasonably all disabilities of the claimant recognized by the ALJ'" because the hypo did not include various impairments and limitations described in post-hearing

examination reports which were not contradicted by other testimony or medical records.  <u>Body</u>, 239 F.3d at 707 (quoting <u>Bowling</u>, 36 F.3d at 436).

Plaintiff's complaint in the present case is that the ALJ failed to credit the answer to the hypothetical question which included the limitations embraced by Dr. Gervais or those resulting from medication side-effects or pain.  As was noted earlier in connection with plaintiff's first claim, the ALJ made specific credibility determinations regarding plaintiff's allegations of pain and medication side-effects.  <u>See</u>, e.g., <u>Vaughn</u>, 58 F.3d at 132.  The ALJ ultimately found that limitations due to such side-effects lacked objective support in the record and that plaintiff's pain was not as disabling as he alleged.  And, as will be discussed more fully in connection with plaintiff's third claim, the opinions set forth in the forms executed by Dr. Gervais on November 9, 2006 are entitled to little weight.  The answer to the hypothetical question relied upon by the ALJ reasonably incorporated the limitations which he found were adequately supported by the objective evidence.  While the hypo relied upon by the ALJ did not specifically identify plaintiff's impairments by name, it did include the limitations resulting from those conditions which were objectively-supported and credible.  No error is apparent here.

In his third and final challenge to the Commissioner's

decision, plaintiff alleges that the ALJ improperly substituted his opinions for those of Dr. Gervais, particularly the opinions set forth in the Pain Interrogatory and the Physical Capacity Evaluation forms completed by the doctor on November 9, 2006, in violation of Social Security Ruling 96-7p and 20 C.F.R. §404.1527.

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion. <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)). A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. <u>Newton</u>, 209 F.3d at 456 (citing <u>Brown v. Apfel</u>, 192 F.3d 492, 500 (5th Cir. 1999) and <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert</u>. <u>denied</u>, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. <u>Newton</u>, 209 F.3d at 456; <u>Martinez v. Chater</u>, 64 F.3d 172, 176 (5th Cir. 1995); <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987); <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require the ALJ to

35

perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §404.1527(d) only in the absence of controverting medical evidence from other treating and/or examining physicians. Newton, 209 F.3d at 453.

On February 3, 2004, Dr. Heidenreich referred plaintiff to Dr. Gervais after diagnosing him with neck pain with radiculopathy and elbow pain. However, plaintiff was not seen by Dr. Gervais until May 26, 2004. Although the doctor did note some tenderness to the left shoulder and elbow, there was no spasm and range of motion was intact. The diagnosis was neck pain with mild radiculopathy and no specific treatment was administered. Instead, Dr. Gervais intended to monitor plaintiff for possible drug-seeking behavior or symptom embellishment, observing that plaintiff had prematurely exhausted the supply of Vicodin that Dr. Heidenreich had previously prescribed. The doctor also observed that plaintiff had not followed the treatment regimen that had been imposed on him as the Regulations require. 20 C.F.R. §404.1530.

Plaintiff returned to Dr. Gervais on June 7, 2004. He had cervical tenderness but no spasm. Range of motion was limited by pain but reflexes and strength were intact. Dr. Gervais declined to change plaintiff's work status pending review of urinalysis results but nothing in the doctor's previous treatment note indicates that plaintiff was restricted from work or any other

activity.  The Court recalls that on April 27, 2004, just 1 month before his first visit with Dr. Gervais, plaintiff had been cleared to resume regular activities by Dr. Stokes.  On June 18, 2004, Dr. Gervais characterized plaintiff's pain as "intractable" but plaintiff was taking no pain medication at the time.  Soma and Keppra were prescribed and Dr. Gervais kept plaintiff off work until he could be re-evaluated.  Plaintiff reported on June 24, 2004 that he could cook, help with household chores, cut the grass, drive, and shop.  Plaintiff's ability to do so is not indicative of someone who is unable to perform any work.  <u>Selders</u>, 914 F.2d at 618-19; <u>Anderson</u>, 887 So.2d at 632; <u>Chapparo</u>, 815 F.2d at 1010.

On August 11, 2004, plaintiff reported positive, albeit short-term, results with Soma.  There was tenderness to the left trapezius area but shoulder range of motion was normal.  The diagnosis was only neck pain with mild C5-6 radiculopathy and left carpal tunnel syndrome.  The dosages of Soma and Keppra were increased in an attempt to enhance their effectiveness.  Despite these rather limited findings, Dr. Gervais opined that plaintiff could engage in no work activity whatsoever.  The following month, plaintiff was evaluated by Dr. Carroll whose report is the most comprehensive one appearing in the record.  Dr. Carroll found that plaintiff had moderate limitations to his right forearm and wrist with decreased grip strength but no limitations respecting the

right elbow, shoulder, or knee. Plaintiff's condition was essentially unchanged when he returned to Dr. Gervais on October 12, 2004 and the diagnosis was left carpal tunnel syndrome and C-6 radiculopathy with neck pain. Keppra was continued. At the time of the hearing held before the DHO on December 1, 2004, plaintiff was taking college courses 5 days per week.

Plaintiff was seen again by Dr. Gervais on March 8, 2005 and he reported good results with Soma. See Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987). The diagnosis was again C-6 involvement with neck pain and Soma was continued. It was not until 10 months later that plaintiff was reevaluated by Dr. Gervais and his neck pain was the same. Another medication was to be substituted for Keppra and the dosage of Soma was to be decreased. Plaintiff's neck pain was worse when he was seen the final time by Dr. Gervais on August 8, 2006 but he had run out of Lyrica which he reported was effective in managing his pain. Plaintiff had tenderness on the left side of the neck but there was no atrophy, tone was normal, and fine motor function was present bilaterally. The diagnosis was left C5-6 radiculopathy, low back pain, and possible tendonitis.

On November 9, 2006, Dr. Gervais executed the Pain Interrogatory and Physical Capacity Evaluation forms that had been provided to him by plaintiff's counsel. Dr. Gervais answered only

3 of the 5 questions posed on the Pain Interrogatory and the answers that he did provide were not particularly illuminating and lack objective support in the record.   For example, none of the doctor's previous treatment notes document any complaints of medication side-effects yet the doctor was now representing that the medication caused sedation.   Common to both of the forms is that they contained no contemporaneously-recorded, medically acceptable findings supporting the doctor's opinions.   The opinions, therefore, are entitled to little weight.   Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980).   Viewing the record as a whole, the ALJ did not substitute his opinions for those of Dr. Gervais but simply gave the doctor's opinions the weight they deserved.

### RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court,

provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this __19th__ day of ____September____, 2008.

_____
UNITED STATES MAGISTRATE JUDGE

40